**Carl Raymond HARPER, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 01–90–00997–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

May 30, 1996.

Thomas D. Moran, Houston, for Appellant.

John B. Holmes Jr., Lester Blizzard, Suzanne Brown, Houston, for Appellees.

Before HUTSON–DUNN, MIRABAL and HEDGES, JJ.

## OPINION

HUTSON–DUNN, Justice.

Appellant, Carl Raymond Harper, was charged with the offense of aggravated robbery. The indictment also contained an enhancement paragraph alleging that appellant had previously been convicted of robbery. Appellant pled "not guilty," and proceeded to a trial by jury. The jury found appellant guilty and the enhancement paragraph to be true and sentenced him to 99–years confinement.

Appellant perfected his appeal in the First Court of Appeals on May 23, 1991. Among other points of error, appellant raised a *Batson* issue.[1] On February 13, 1992, this Court abated the appeal and remanded appellant's cause to the trial court to conduct a *Batson* hearing. This Court further ordered the trial court to make appropriate findings of fact and conclusions of law and prepare a record of the *Batson* hearing proceedings. The trial court conducted the hearing on March 5, 1992, and eventually filed its findings of fact and conclusions of law on December 22, 1994. The trial court found the prosecutor gave race-neutral reasons for striking each of the three prospective jurors. Appellant is now before this Court reurging his original seven points of error, and additionally asserting

---

1. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

that the trial court erred in overruling his *Batson* motion. We affirm.

### Summary of Facts

On the evening of February 5, 1990, Natalie Clark was working at the Diamond Shamrock (the store), a small gas station and convenience store. Around 6:30 p.m., Clark's boyfriend, Jerry French, came by to visit Clark and pick up her child. When he was visiting with Clark, he noticed a strange van backed into a parking space in front of the store. French became curious and went outside to investigate. As French was investigating, appellant approached him. French asked if he could help, but appellant responded he was just waiting for his wife. Shortly thereafter, French got in his car and left.

About five minutes later, appellant went into the store. At the time, Clark was on the phone with her ex-husband, Tim Langford. Appellant went to the cooler and selected a twelve-pack of beer. He went to the counter with his beer and requested four packs of cigarettes. When Clark reached for the cigarettes, appellant drew a .38 caliber pistol from his jacket and pointed it at Clark. Clark hung up the phone without saying anything to her ex-husband. She and Langford had an agreement that if she hung-up the telephone without saying anything, he should call the police.

Appellant ordered Clark to open the cash register and ordered her to get on the floor. Appellant took the money out of the cash register and left. Clark remained on the floor a few minutes until appellant left. When she got up, she saw appellant drive off in a dark van. She was not able to see the license plate number because the plate was smeared with mud.

Clark immediately called the police, who were already on their way. Within a few minutes, Deputy Hayward arrived and obtained a description of appellant, his van, and the direction in which he was traveling.

Hayward immediately broadcast this information to other police units in the area. Within a minute or two, Trooper Gene Wilganowski spotted appellant's van traveling north of the store. Wilganowski attempted to pull appellant over. Appellant stopped, but when Wilganowski approached the van, appellant took off. From this point, a high speed chase ensued that lasted for approximately 30 miles. By surrounding appellant's van as it traveled down the road, the police were able to slow appellant down and eventually stop him. Hayward immediately got out of his car and drew his weapon and advanced on the van. As he ordered appellant to get out of the van, appellant pulled his gun out and shot himself. The officers took appellant out of the van, and because he resisted the officers, they handcuffed him. Appellant testified at trial that the gunshot wound caused him brain damage and he could not remember any events concerning the robbery.

### Analysis

In his first point of error, appellant contends the trial court erred in overruling his objections to the introduction of evidence of his flight and his attempted suicide while being taken into police custody. Appellant contends the testimony concerning the flight was not relevant under Tex.R.Crim.Evid. 401 because he was not immediately pursued from the store and the robbery was complete at the time the police chased him. Alternatively, in his second point of error, appellant argues the trial court erred in failing to include a limiting instruction regarding the jurors' consideration of his flight in accordance with Tex.R.Crim.Evid. 404(b).[2] Finally, in his third point of error, he argues that the trial court erred in admitting the extraneous offenses of appellant's flight and attempted suicide because the State did not give proper notice in compliance with Tex. R.Crim.Evid. 404(b). We address these points of error together.

---

2. Tex.R.Crim.Evid. 404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided, upon timely request by the accused, reasonable notice is given in advance of trial of intent to introduce in the State's case in chief evidence other than that arising in the same transaction.

Appellant was indicted for aggravated robbery. The elements of aggravated robbery are (1) a person; (2) in the course of committing theft; (3) with intent to obtain or maintain control of property; (4) intentionally or knowingly; (5) threatens another with, or places another in fear of; (6) imminent bodily injury or death; and (7) uses or exhibits; (8) a deadly weapon. TEX.PENAL CODE ANN. § 29.02–.03 (Vernon 1994). "In the course of committing theft" means "conduct that occurs in an attempt to commit, during the commission, or *in immediate flight after the attempt or commission of theft.*" TEX.PENAL CODE ANN. § 29.01(1) (Vernon 1994); *Oggletree v. State,* 851 S.W.2d 367, 368–69 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd) (emphasis added). Because evidence of flight and conduct occurring during flight proves an element of aggravated robbery, we find that evidence of appellant's flight and attempted suicide is admissible to prove an element of aggravated robbery. Further, evidence of appellant's attempted suicide supports Clark's testimony that appellant had a gun.

Appellant argues, though, that the flight was separate from the primary offense of aggravated robbery because the police did not catch him until after the robbery was complete. We disagree. A lapse of time between the commission of the offense and the defendant's flight does not always adversely affect admissibility of the flight. *Burks v. State,* 876 S.W.2d 877, 903 (Tex. Crim.App.1994). The record shows that the police had a full description of appellant and his van and spotted appellant within a few minutes after the robbery. Trooper Wilganowski attempted to stop appellant immediately after the robbery. When Wilganowski got out of his car and announced he was from the Texas Highway Patrol and asked appellant to get out of the car, appellant took off. As the police chased appellant, appellant threw beer cans at them. Appellant stole a twelve-pack of beer from the store. All these factors considered together lend support that appellant was fleeing the scene of the robbery.

Because evidence of appellant's flight goes to prove an element of the offense of aggravated robbery, it is relevant evidence under TEX.R.CRIM.EVID. 401. Further, appellant's flight and attempted suicide are not "extraneous offenses" under TEX.R.CRIM. EVID. 404(b). Accordingly, the trial court was not obligated under rule 404(b) to give the jury a limiting instruction, nor was the State obligated to comply with the notice requirement in rule 404(b). Therefore, we hold the trial court did not err in admitting the evidence of appellant's flight and attempted suicide. We overrule appellant's first, second, and third points of error.

In appellant's fourth point of error, he contends the trial court erred in admitting evidence of appellant's prior convictions as impeachment during the guilt/innocence phase of the trial. Appellant filed a request for notice pursuant to TEX.R.CRIM.EVID. 609(f). It read, "defendant requests notice of the State's intent to use evidence of prior convictions to impeach the following witnesses and the offenses involved: (1) defendant, Carl Raymond Harper, (2) Don Owen and (3) Don Owens." The State did not comply with this notice requirement. The first time appellant had any notice that the State intended to use the prior conviction was after he had taken the stand and given his direct testimony.

TEX.R.CRIM.EVID. 609(f) provides:

Evidence of a conviction is not admissible if after timely written request by the adverse party specifying the witness or witnesses, the proponent fails to give to adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

Appellant argues that because he requested notice from the State and the State did not provide it, his impeachment with his prior convictions was improper.

Rule 609(a)–(f) governs impeachment of witnesses by evidence of conviction of crimes; the rule does not specifically address a defendant as a witness. However, once a defendant in a criminal prosecution takes the witness stand, the defendant is subject to the same rules as any other witness and may be

impeached, contradicted, made to give evidence against himself, cross-examined on new matters, and treated in every respect as any other witness, except when there are overriding constitutional or statutory provisions. *Sinegal v. State,* 789 S.W.2d 383, 387 (Tex.App.—Houston [1st Dist.] 1990, pet. ref'd). In our case, appellant testified and the rules that apply to witnesses equally apply to him.

The State argues that since appellant's counsel knew of the prior conviction and simply wanted notice of whether the State intended to use the prior conviction, appellant was not ambushed by the use of the prior conviction.[3] The State relies on *Cream v. State,* 768 S.W.2d 323, 326 (Tex.App.—Houston [14th Dist.] 1989, no pet.), for the proposition that rule 609(f) exists to prevent an ambush upon an adverse party's witness when the witness has not had a fair opportunity to contest the use of a prior conviction. In that case, the court concluded that the lack of written notice did not preclude use of a prior conviction because "the only convictions appellant had to consider before taking the witness stand were those already known to him." *Id.*

We find the reasoning presented in *Cream* unpersuasive. If we were to read rule 609(f) like the *Cream* Court did, the notice requirement would never apply unless a witness could show complete unawareness of his or her own prior convictions. However, the rule does not exist for the State to provide notice only when it intends to impeach a witness or defendant-witness with a prior conviction of which he is unaware. Rather, the rule exists to provide, upon request, the witness or defendant-witness *notice* that the State intends to impeach with the prior convictions. Any other interpretation would render rule 609(f) meaningless. The rule requires notice to be given upon request, and if the notice is not given, evidence of the prior conviction is not admissible. TEX. R.CRIM.EVID. 609(f). Therefore, we hold that because appellant requested notice and the State did not provide it, the trial court erred

in allowing the State to impeach appellant with his prior conviction.

TEX.R.APP.P. 81(b)(2) mandates that an appellate court reverse a judgment under review unless the court determines beyond a reasonable doubt that the error made no contribution to the conviction or to the judgment. Therefore, we must decide whether harm resulted from the admission of appellant's prior conviction of robbery. We apply the harmless error standard articulated in *Harris v. State,* 790 S.W.2d 568, 585–88 (Tex.Crim.App.1989), and *Roberts v. State,* 866 S.W.2d 773, 775 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd). The court should calculate the error's probable impact on the jury in light of the existence of the other evidence. *Harris,* 790 S.W.2d at 587–88. To reach such a determination, the court should first isolate the error and all its effects, and then ask whether a rational trier of fact might have reached a different result if the error and its effects had not resulted. *Id.* at 588. In performing the isolating analysis, the court examines the source and nature of the error, the extent to which the State emphasized the error, and the error's possible collateral implications. *Id.*

Any error in admitting appellant's prior conviction was harmless. Evidence of appellant's guilt was overwhelming in this case. Natalie Clark was able to identify appellant as the man who came into the store, pointed a gun at her, told her to lie on the floor, and then took the money in the cash register. French testified that appellant was the man he saw in the parking lot of the store just minutes before the robbery occurred. Clark gave a full description of appellant and his car to the police. The police spotted appellant only minutes after the robbery. Trooper Wilganowski testified he tried to stop appellant, but appellant sped off and lead the police on a 30–mile chase. At the end of the chase, appellant shot himself in the head. All appellant testified to is that he could not remember anything about the robbery because the gunshot caused him brain damage.

---

3. Appellant's counsel told the court, "That is quite correct. We knew that the conviction was there. In fact, it's alleged in the indictment.

What we asked for was notice for the State's intent to impeach him with that conviction."

Thus, appellant provided no controverting testimony about the offense.

We note that appellant's past conviction of robbery is similar to his present charge. However, the danger that the jury convicted appellant based on a perception of a past pattern of conduct rather than on the facts of this offense is extremely small. The prosecutor elicited the prior conviction at the beginning of cross-examination. The prosecutor did not mention it during closing arguments, but instead emphasized the overwhelming testimony in support of appellant's guilt. Upon examining the whole record, we conclude beyond a reasonable doubt that the error did not contribute to the conviction. We overrule appellant's fourth point of error.

In appellant's fifth and sixth points of error, he complains the trial court erred in failing to include two requested jury charge instructions on the issue of punishment. The first requested instruction invited the jury to consider federal sentencing guidelines. The second requested instruction invited the jury to consider the facts of the instant offense as well as any mitigating or aggravating circumstances submitted by either party. We will address these individually.

### 1. *Instruction of the federal sentencing guidelines*

■ Appellant argues he was entitled to a jury charge that included provisions of the federal sentencing guidelines. TEX.CODE CRIM.PROC.ANN. art. 36.14 (Vernon Supp. 1996) provides that the trial court "shall, before the argument begins, deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case. . . ." The federal sentencing guidelines have no application to this state criminal case. Therefore, the trial court had no authority or obligation to instruct the jury on the federal sentencing guidelines. We find no error.

### 2. *Instruction on the mitigating and aggravating circumstances*

■ Appellant argues he was entitled to a jury charge that instructed the jury it could consider mitigating and aggravating circumstances when deciding his punishment. The jury charge submitted provided in part:

> You are instructed that you must now assess the punishment of the defendant at confinement in the institutional division of the Texas Department of Criminal Justice for not less than fifteen years nor more than ninety-nine years or life.

> The burden of proof in all criminal cases rests upon the State throughout the trial and never shifts to the defendant.

> . . . .

> In arriving at your verdict, it will not be proper to fix the same by lot, chance, or any other method than by a full, fair and free exercise of the opinion of the individual jurors under the evidence admitted before you.

> You are the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given the testimony, but you are bound to receive the law from the Court, which is herein given you, and be governed thereby.

> You are admonished that in deliberating upon this matter, you must not refer to nor discuss any matter not in evidence before you. After you have reached a unanimous verdict, the Presiding Juror will certify thereto by using the appropriate form attached to this charge and signing the same as Presiding Juror. After argument of counsel, you may retire to consider your verdict.

Appellant wanted additional instructions given to the jury to help guide it in considering the punishment it would assess:

> In order to guide you and aid your discretion, you are hereby instructed that in arriving at the appropriate punishment, you may consider the facts of the offense, as well as any mitigating or aggravating circumstances submitted by either the state or the defendant.

> In arriving at your decision, you should consider all of the evidence that you find to be credible and you should not automatically assess either the minimum or maximum sentence.

Appellant argues this instruction is important in view of the brain damage he suffered

during his attempted suicide. He argues that if the jury had properly been instructed, it could have considered appellant's mental status as a mitigating circumstance and his criminal history as an aggravating circumstance.

There is *nothing in the charge* submitted to the jury that prohibited the jury from considering any and all evidence that it heard, including appellant's brain damage and prior criminal history. The refusal of a requested instruction is not harmful to the defendant if the charge given adequately presents the law and circumstances to the jury. *See Cruz v. State*, 820 S.W.2d 41, 43–44 (Tex.App.—Austin 1991, pet. ref'd). Further, when the charge refused is substantially the same as that given by the court, no harm is shown. *Video News, Inc. v. State*, 790 S.W.2d 340, 347 (Tex.App.—Houston [1st Dist.] 1990, no pet.). The charge given adequately instructs the jury of the range of punishment, and that it can consider all of the evidence presented to them in trial. Because the charge given is substantially similar to the charge requested, we hold no harm is shown. We overrule appellant's fifth and sixth points of error.

In his seventh point of error, appellant contends the trial court erred in denying his motion for the appointment of an expert witness. Appellant filed a motion specifically requesting that Dr. Fason conduct a physical examination to determine what effect, if any, the brain damage would have on his future dangerousness. Attached to the motion was an affidavit signed by Dr. Fason stating that injuries such as that suffered by appellant can make a person more or less likely to commit future crimes of violence, or have no effect at all. The trial court denied the motion.

Appellant argues it was error for the trial court to deny his motion because Tex.Code Crim.Proc.Ann. art. 26.05 (Vernon 1989) provides that as an indigent defendant, he is entitled to expert psychiatric evaluation upon request. The necessity for the appointment of an expert depends on whether the defendant has made a sufficient threshold showing of need for the expertise in assisting in the evaluation, preparation, and presenta-

tion of his defense. *Rey v. State*, 897 S.W.2d 333, 337 (Tex.Crim.App.1995). Implementation of this principle requires that a defendant be provided with the basic tools of an adequate defense at trial. *Id.* However, neither the rules of criminal procedure nor case law provides a defendant the right to have an expert witness appointed during the punishment phase of trial. Assuming, arguendo, that appellant is entitled to appointment of an expert witness during the punishment phase of trial, an indigent defendant has no constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. *Knight v. State*, 868 S.W.2d 21, 23 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd) (citing *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985)). Therefore, it was not error for the trial court to deny appellant's motion specifically requesting Dr. Fason to examine him. We overrule appellant's seventh point of error.

In his eighth point of error, appellant contends that the trial court erred in denying his *Batson* motion. To invoke the protection of *Batson*, the defendant must first raise an inference of purposeful discrimination through the State's use of its peremptory strikes. *Gardner v. State*, 782 S.W.2d 541, 544 (Tex.App.—Houston [1st Dist.] 1989, pet. ref'd). Once the defendant raises such an inference, the burden of production shifts to the prosecutor to give racially neutral explanations for the peremptory strikes. Then, the burden shifts back to the defendant to persuade the trial court that the neutral explanation is really a pretext for discrimination. *Id.* The trial judge is the factfinder and, as such,

> must necessarily gauge the credibility of [the prosecutor's] testimony, determined in part, at least, by the plausibility of his explanation. This task is no different in principle than any other factfinding enterprise.

*Id.* We will not substitute our judgment of the witness's credibility and evidentiary weight for that of the factfinder. *Id.* "A reviewing court should reverse [the trial court's] findings only when they are not sup-

ported by sufficient evidence or, as we often say, for an 'abuse of discretion.'" *Id.*

■ Appellant is a white man. Appellant timely objected to the jury panel, which contained two black members, on the grounds that the State struck three of the five black veniremembers for racial reasons. The total number of black members on the panel was disputed; however, the dispute was limited to whether there were five or six black veniremembers on the panel. Appellant challenged the strikes against veniremembers Gobert, Harrison, and Fountain. We must review each peremptory strike of a black venireperson and the plausible, racially neutral explanation offered by the State for each.[4] *Jones v. State,* 818 S.W.2d 532, 534 (Tex.App.—Houston [1st Dist.] 1991, no pet.).

■ At the *Batson* hearing, the prosecutor offered her race-neutral reasons for striking the three veniremen. Ms. Gobert was a black woman. The prosecutor testified that Ms. Gobert improperly filled out her jury card. In the spaces where the card provides for the name of the juror's spouse, Gobert wrote in her own name. In the portion for her spouse's employment, she put in her own employer. The prosecutor testified that Gobert was "an older lady and that was what I recalled about her, and I felt she might have a statutory reason for not being a member of the jury but I didn't want to bring her up and embarrass her about not being able to read very well so I just struck her." Striking jurors who put their own name in the space provided for the spouse's name is a legitimate, nonracial reason for striking a veniremember because it indicates that the individual may have a difficult time following the court's directions. *Jones,* 818 S.W.2d at 536. Thus, the State established a racially

neutral reason for the exclusion of Ms. Gobert.

Mrs. Harrison and Mr. Fountain, both black veniremembers, were also peremptorily stricken from the panel. A review of the record reveals that the entire venire was asked whether it believed the purpose of punishment was to deter, to rehabilitate, or to impose retribution (punish) for crime. It was also asked whether any member had a close friend or was related to anyone who had been arrested and/or convicted for offenses other than traffic offenses. Mrs. Harrison answered that the primary purpose of punishment was rehabilitation. Mrs. Harrison also answered that she had a brother who was arrested for drugs two years ago.

■ The prosecutor offered her race-neutral reasons for striking Mrs. Harrison. She testified that she struck Mrs. Harrison because she answered "rehabilitation" as the primary purpose of punishment, along with the fact that she had a brother who had been arrested or convicted for possession of a controlled substance. The Court of Criminal Appeals has held that a prospective juror's belief that rehabilitation is the primary emphasis of criminal punishment is a race-neutral reason to strike a veniremember. *Adanandus v. State,* 866 S.W.2d 210, 224–25 (Tex. Crim.App.1993); *Brooks v. State,* 894 S.W.2d 843, 846 (Tex.App.—Tyler 1995, no pet.). Thus, the State established a racially neutral reason for the exclusion of Mrs. Harrison.

■ Finally, the prosecutor offered her race-neutral reasons for striking Mr. Fountain. She said that in response to her question about the primary purpose of punishment, Mr. Fountain answered rehabilitation.[5]

---

4. The State argues appellant did not raise a prima facie case of purposeful discrimination. In our order of February 13, 1992, this Court already found that appellant raised a prima facie case of purposeful discrimination. Furthermore, the preliminary issue of whether appellant made a prima facie showing becomes moot when the prosecutor articulates his reasons for the challenged peremptory strike and the trial court rules on the ultimate question of intentional discrimination. *Hill v. State,* 827 S.W.2d 860, 865 (Tex. Crim.App.), *cert. denied,* 506 U.S. 905, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992).

5. The statement of facts reflects that Mr. Fountain actually answered "punishment and rehabilitation." When questioned about this, the prosecutor responded:

I have something written on here [her notes] but it's crossed out so I don't know if I had misnumbered or something where, and put the answer by another juror and his and then crossed it out once I spoke to him or whether or not he initially said it was punishment and rehabilitation and when I pressed him on the issue he told me he believed the sole purpose was rehabilitation.

She said she struck him because she "felt like this was, the defendant was going to be found guilty but this was purely a punishment case ... and I didn't want anybody on the jury who felt like he could be rehabilitated or somebody who needed rehabilitation rather than giving a maximum sentence." This is a race neutral reason to strike a veniremember.

 In view of all of the above, we find the State provided racially neutral explanations for its peremptory strikes and overcame the presumption of discrimination. When race neutral reasons are offered, the burden shifts back to the defendant to persuade the trial court by a preponderance of the evidence that the neutral explanation is really a pretext for discrimination. *Gardner*, 782 S.W.2d at 544. The following types of evidence may be used to show sham or pretext in the State's purportedly race-neutral explanations:

(1) The reasons offered by the prosecutor are not related to the facts of the case;

(2) a lack of questioning of the challenged venireperson, or a lack of meaningful questions;

(3) disparate treatment of the venirepersons—persons with the same or similar characteristics as the challenged venireperson were not struck;

(4) disparate examination of the venirepersons—questions designed to provoke certain responses that are likely to disqualify black venirepersons were put to blacks, but not to whites;

(5) the percentage of peremptories used to strike minority panel members; and

(6) an explanation based on a group bias where the group trait is not shown to apply to the challenged venireperson specifically.

*Id.* (citing *Keeton v. State*, 749 S.W.2d 861, 868 (Tex.Crim.App.1988)).

 Appellant argues that there was disparate treatment of veniremembers because Mr. Fountain was stricken but a white juror who answered the same way as Mr. Fountain was not. The record shows that when Fountain was asked what the primary purpose of punishment was, he answered punishment and rehabilitation. Appellant wants us to balance Fountain's answer against that of another panel member, Ms. Furnish, who answered the same way yet was not stricken. Ms. Furnish answered that the primary purpose of punishment was "punishment and hopefully rehabilitation." Further, appellant points out that Ms. Furnish answered that she had a brother who had been arrested and/or convicted several times. Appellant asserts this shows a disparate treatment of veniremembers because Ms. Furnish was not struck.

 The prosecutor was questioned concerning the prospective jurors, Furnish and Fountain. She said she thought that the answers they both gave were functionally different. Specifically, she explained, "in looking at what he [Mr. Fountain] said, he said punishment and rehabilitation. She [Ms. Furnish] seemed a little bit stronger, it appears to me, that punishment was her main goal and hopefully to rehabilitate was an after thought. But as I said, according to my notes, all he said was rehabilitation." The prosecutor made a valid distinction between the two veniremembers' answers. Further, the State's decision to strike some venire members who expressed certain concerns is not undermined by its failure to strike all members who expressed the same concerns. *Roberts v. State*, 866 S.W.2d 773, 776–77 (Tex.App.—Houston [1st Dist.] 1993, no pet.). Therefore, appellant has not met his burden of showing sham or pretext in the State's purportedly race-neutral explanations. We hold the trial court's ruling in regard to the State's use of a peremptory challenge against Gobert, Harrison, and Fountain was not clearly erroneous.

Appellant also complains the trial court erred when it sustained the State's objection to the use of the statement of facts during cross-examination of the prosecutor. Thereafter, appellant made a bill of exceptions concerning his cross-examination of the trial prosecutor with the statement of facts from the voir dire examination. By not having the opportunity to make these inquiries, appellant claims he was denied the opportunity to show that the prosecutor's stated race-neutral reasons are not supported by the record.

We disagree. After reviewing the bill of exceptions, we hold appellant did not elicit anything from the prosecutor that showed a pretext or a sham. Therefore, appellant was not harmed when the trial court sustained the objection. We overrule appellant's eighth point of error.

We affirm the judgment of the trial court.

MIRABAL, Justice, concurring.

In this case, appellant's prior robbery conviction was alleged in the indictment, and defense counsel had seen the TDC pen packet in the State's file before trial. The majority holds that, even though appellant and his counsel had full knowledge of the State's awareness of the conviction, the trial court erred in allowing the State to use the conviction to impeach appellant when he took the stand. I disagree.

In my opinion, the trial court properly overruled appellant's objection based on TEX. R.CRIM.EVID. 609(f). The purpose of this rule is "to provide the adverse party with a fair opportunity to contest the use of such evidence" of a prior conviction. TEX.R.CRIM. EVID. 609(f). Armed with the knowledge he had about the conviction and the State's awareness of the conviction, appellant certainly was on notice that, if he took the stand to testify in his own behalf, the State would attempt to impeach him with the conviction. There was no surprise or "lack of a fair opportunity to contest the use of such evidence" in this case. Unlike the majority, I agree with the reasoning of our sister court in *Cream v. State*, 768 S.W.2d 323, 326 (Tex. App.—Houston [14th Dist.] 1989, no pet.).

I would overrule appellant's point of error four because the trial court did not err.